Columbia Falls Aluminum Company, LLC v. Atlantic Richfield Company. And when counsel for the appellants is ready to proceed, Appellant, we'll be happy to hear from you. Thank you, Judge Watford. May it please the Court. Your Honors, the question in this appeal is whether the District Court properly allocated the costs of remedying environmental contamination at an aluminum smelting site in Montana, which was operated by Appellant ARCO from 1955 to 1985 and then by the Appellant Columbia Falls from 1985 to 2009. The District Court found that ARCO was the primary contributor to site contamination. It found that ARCO enjoyed more than two times the profits, roughly a quarter of a billion dollars more than Columbia Falls. And it found that unlike Columbia Falls, which consistently cooperated with the EPA, ARCO declined to do so and instead fought tooth and nail against the recovery of remedial costs. And yet the District Court allocated more than two times the cost of the cleanup to Columbia Falls and just a third to ARCO. That allocation is the product of three separate errors, each of which requires that the allocation be set aside. First, the District Court shifted CERCLA costs based on a contract that the Court itself found evinced no intent to cover CERCLA claims. Second, the District Court adopted a novel linkage to remedial action test that contravened the very... Counsel, can I ask you a question? Even if we assume that the contract itself was unenforceable, this was an equitable proceeding, right? Correct. And under the Cadillac, the holding of the Cadillac case, that contract really wouldn't be that meaningful, would it? Well, it certainly was meaningful to the liabilities covered, Your Honor. I mean, what's different about this case and Cadillac and the Beezer case, on which our friends rely, is that in this case the Court found that there was no intent to cover CERCLA claims. That's in paragraph 88 most clearly. In the Cadillac case, the contract there unambiguously sought to hold Dow Chemical harmless against the government. Now, that contract was signed before CERCLA.  Assume there was no contract. As an equitable matter, the Court still had the ability to decide how to apportion the remediation costs, right? Of course. Right. And that's basically what he did. But he has to do so in a way that is explained, not inconsistent, and rational. I mean, that's under this Court's Merit Pride case, TDY holding case, and the Court didn't do so. I mean, if you look at paragraphs 88, where it said there was no intent in the contract, evidence of an intent to cover CERCLA claims, and then you go to the equitable analysis at paragraphs 410 and 411, it said that the contract covered the very liabilities at issue, which is CERCLA liability, and therefore warranted shifting costs. That is a complete inconsistency that was unexplained. And again, it's unlike Cadillac and Beezer. In that case, the Court found that there was an intent to cover the liabilities at issue. It simply wasn't enforceable in a contract matter based on technical or jurisdictional reasons. This case is like the Trinity case out of the Third Circuit, where the Court found that there was no evidence of an intent to cover CERCLA liabilities, and therefore it was an abuse of discretion to rely on the contract to shift liabilities based on CERCLA. I mean, if the contract had said, we indemnify for X, but we do not cover CERCLA, then I don't think anyone would be arguing that it would be appropriate to shift liability as an equitable basis or anything else with respect to CERCLA liabilities. The contract in this case, the Court found, evinced no intent to cover CERCLA. And that was under the — Roberts. Can I follow up with that? If I understand opposing counsel's argument, it's not that the Court found there was no intent to cover any CERCLA, but that there was no intent to cover all CERCLA, to shift liability all the way to the other side. How would you respond to that? I would point you to paragraph 88, Your Honor, where the Court said, and I'm quoting, neither the language of the agreement nor the party's intent as distilled from extrinsic evidence shows that Columbia Falls agreed to forego a CERCLA claim. Which is — and I think that's consistent with the findings in paragraph 46 and paragraph 47, where the Court found with respect to 10a that it was unambiguously didn't cover CERCLA, and with respect to 10b, that while the language was ambiguous, the extrinsic evidence showed that the parties did not intend for it to cover it. So your point is the parties clearly contracted around indemnification. Yes. And there was a time limit in the — there's a five-year period in which CFAC could seek indemnification. But there is — but the contract or the extrinsic evidence do not speak to statutory claims like CERCLA recovery. And it's fundamentally inconsistent to say that there was no intent to cover CERCLA on the one hand, and then to use the indemnification language to assume an intent to shift over those same costs on the other for the equitable allocation. Is that the gist of what you're getting at? That's exactly right. And the Trinity case out of the Third Circuit applies that reasoning to hold that an adjustment in that case was an abuse of discretion. And look, I mean, CERCLA was the elephant in the room here. I mean, the district court itself found that ARCA was the subject of several pending CERCLA actions at the time the contract was negotiated in paragraph 86. And yet there was no evidence, the court also found in paragraph 88, of an intent from the language of the agreement or the parties' extrinsic evidence to address CERCLA claims. Given that was the case, it was an abuse of discretion to then turn around and shift costs on the basis of the contract. Now, there was a host of other considerations the district court applied. But this court has to review its reasoning and look to determine whether it was inconsistent, unexplained, or implausible. And here I think it was each of those with respect to the way it shifted costs on the contract. Can I? No, I'm sorry. Go ahead. No, go ahead. Go ahead. I don't want to. I'll come back. Just paragraphs 410 and 411 in the allocation part where I think Judge Malloy does attempt to reconcile these what you contend are irreconcilable findings. So help me understand why he is being completely irrational and insane. I'm just reading this part. Even if not enforceable as a matter of contract law to bar CFAC's CERCLA claims, the party's intent as reflected in the circumstances of the sale and their subsequent conduct was that ARCA would have no further liability to CFAC after five years after the sale. And then in the subsequent paragraph it says basically, and that intent related to the very environmental liabilities that were at issue here. I guess I read that as the more significant finding of intent. And it seemed to me it wasn't completely irreconcilable with his earlier finding, but you say that it was. I think it is, Your Honor. I mean, I think if all we had was what was in paragraphs 410 and 411, I think you would reason that the court believed that there was an intent to cover CERCLA claims, but perhaps it didn't make a clear statement or something like that. But the court has to read the whole decision. And if you go back to the part of the decision where he makes his contractual ruling, paragraph 88, the court was unambiguous that there was no intent evidenced by the language of the agreement or the party's extensive extrinsic evidence to cover CERCLA claims. So in light of that finding, I don't think when he says it covered the very liabilities at issue, I mean the very liabilities at issue now in this case are CERCLA liabilities. And so I think there's a patent inconsistency there that is not explained. Okay. But why can't the – I mean, maybe it depends on how we read the earlier finding. There is one reading, I suppose, in which you could say that, well, the party's clearly intended to shift responsibility for environmental liabilities to your client post-1990, but they just didn't think in clear enough terms about CERCLA liabilities specifically. They didn't call that out with the specificity that Montana law requires, and so therefore that's why it can't be enforced as a matter of contract law. But if the underlying intent were nonetheless to shift liability to your client for the very kinds of environmental liabilities at issue here, why couldn't the court take that into account as an equitable consideration? So I think the way you've recharacterized things, that's closer to the cases, but I don't think that was what was going on here. I mean, like if you take the Beezer case, for example, and this is consistent with Cadillac, in those cases the court found unambiguously that there was a mutual intent to cover CERCLA liabilities. That intent simply wasn't enforceable as a contractual matter because of the Tucker Act or clear statement rule. Here, there's no finding that there was a mutual intent to cover CERCLA liabilities. Instead, it was just the opposite. The court found that there was no intent to cover CERCLA liabilities, again, in paragraph 88. So that makes this case unlike the others where the court has relied on the contract to shift costs simply because it wasn't enforceable for a particular reason. That makes this case exactly like the Trinity case where the court found that there, too, there was no intent to cover CERCLA costs, and so it was error to shift on the basis of CERCLA. And, again, if the contract had said this doesn't apply to CERCLA liabilities, then I don't think we'd be arguing about whether or not you could rely on the contract to shift CERCLA liabilities. I mean, yes, Your Honor. Can I ask you a question? So you're not saying that there shouldn't be apportionment. Am I correct? Correct. All right. Okay. Okay. Now, having said that, again, getting back to my earlier question, let's assume that there was no contract at all. No contract at all. Okay? You still have to somehow apportion this on the idea of fairness, right? Correct. Okay. Now, CFAC was not somebody that came into this purchase blindly, right? There were people that were aware of what the company did and what the potential liabilities might be, such as CERCLA liabilities, right? I don't know that there was an exact finding to that, but certainly they knew there were environmental liabilities. Right. And so you got this company for a dollar, right, for a dollar. And the way I understand this, if we use, I hope I pronounce this correctly, the RUE remediation costs, if I understand it correctly, CFAC generated $223 million worth of profit, even after you subtract the cost of remediation, right? So tell me why it's not fair the way Judge Malloy arrived at his decision to allocate the costs and the benefits. Why that is not fair, because that's what we're here to decide, right, whether or not it's equitable to apportion the remediation costs the way Judge Malloy found them to be. So I would point you to two factors that the court looked at. Okay. One is the set of GWER factors that looked to who was responsible for the contamination, and the other is the economic benefits factor. Those are non-exclusive, though, right? They're non-exhaustive factors, as I understand it. Well, correct, Your Honor. The district court can select whatever factors it would like within equitable discretion. We're not complaining about the factors he selected. We're complaining about the way in which he applied them. And this court has to take the factors he selected and look at how he applied them. So with respect to the economic benefits, the district court found, and this is in paragraphs 417 and 420, that ARCO earned more than two times the profits as Columbia Falls, roughly a quarter of a billion dollars more. Now, with respect to the $1 sale, it's true that we bought it for a dollar, but by doing so, ARCO saved $7.5 million in costs it would have had to incur to shut down the plant, and we incurred more than $10 million in costs. So that's a little bit of a red herring there. But that's the economics, Your Honor. What about the disparity in the capital contributions that were necessary to generate those profits? So, again, I mean, I think you've got to look at the profits, and the district court here said look at the relative financial benefits. I mean, that's the way he described the inquiry. And if you look at the relative financial benefits, the most obvious one is profits, and ARCO is walking away with a quarter of a billion dollars more in profits. Okay, but that doesn't really respond to my question. Judge Malloy, I think, accepted your opponent's expert's testimony that ARCO had to spend, what, a billion dollars to generate the $500-and-something million in profits, whereas your client had to invest only, what, $95 million in capital contributions? It certainly was less, Your Honor. But just as a conceptual matter, why isn't that a relevant consideration to figure out who got the better, you know, who got more in terms of economic benefits? I think, Your Honor, what I would say is the district court didn't adequately explain that that was the factor that tipped the balance for it for the economic benefits inquiry. I mean, if you look at that part of its decision, there's a reference to the capital costs, but not exactly saying that those costs outweigh the profits. I do want to talk about what I think is the much typically dispositive factor, and that's relative contribution. And on that, the district court found in paragraphs 197, 377, and 392 that ARCO was the primary contributor for site contamination. And again, that is applying the Gore factors, the factors that it selected. And it reasoned that, nevertheless, that that factor didn't weigh in allocating more costs to ARCO because Columbia Falls' lesser contribution at a different site, the wet scrubber storage pond, nevertheless, somehow contributed to the remedial action. But that was error for a couple of reasons. One, that sort of linkage to remedial action inquiry is not part of the Gore factors that the court selected to allocate costs. And this court has held TDY holdings, I believe, that the court has to apply the factors it selects. Two, regardless of what Columbia Falls contributed at the wet scrubber sludge pond, it wasn't as great as what ARCO contributed because the court repeatedly held that it was the primary contributor to the groundwater contamination. But at the landfill site, we basically have the pond and the landfill, right? And Judge Malloy said, ARCO, you were more responsible for contamination at the landfill. Your client was more responsible at the pond. Am I getting that right? With respect, no. The second part, I think, is incorrect. The court said, in fact, that clearly it said that ARCO was the primary contributor at the landfill. For decades, it disposed of spent pot liners in an unlined west landfill. Columbia Falls didn't contribute anything to that landfill. It used a lined landfill. With respect to the wet scrubber sludge pond, both parties contributed to the contamination there. The district court actually acknowledged that ARCO might have contributed more. That was in paragraph 382. The relative toxicity of what your client deposited there, I thought, was significantly greater than what ARCO had. I believe that's incorrect, Your Honor. I think both of them contributed some leachate, and Columbia Falls had some pot liners. I'm quite confident that I've read this several times now, and I'm quite confident that Judge Malloy found that with respect to the pond, at least, your client bore a greater responsibility. But put that aside. With respect to the landfill, I thought Judge Malloy also found that your client, although it deposited less in terms of total quantity of waste, it was on the hook for some greater level of responsibility because your client didn't take action sooner once it had acquired the site. And had it done so, the level of contamination that we see today would have been less. And so, again, even though ARCO might have dumped more waste there, why doesn't that allow Judge Malloy to say, you know, on the whole, I'm finding this to be a lie? Well, this court has to look at the factors that the judge looked to, and those are the Gore factors. And the first factor is distinguishability of the contribution. And here the court clearly found that ARCO was the sole contributor to the West landfill. The second is the amount of hazardous waste. ARCO contributed far more hazardous waste. The third is the degree of toxicity that was in the cyanide. And on that, there was a 50 to 1 margin of cyanide, more contaminants by ARCO. And we explained the record sites to that at page 47 of our brief. And then the third is the degree of involvement. And, again, I don't read the court's decision as saying that what happened at the wet sludge scrubber pond somehow outweighed what happened at the West landfill. I mean, just to be clear, if you look at the map. I wasn't saying that. You're right. If you look at the map on page 496, the wet sludge scrubber pond is downhill from the landfill. The landfill is the source of the primary contribution. Basically, the groundwater is coming down. And so yet what the district court reasoned was that, well, we've got to build a wall around all of this. And so, therefore, you know, it's a wash. But I'm sorry. I tried to point you to the finding that, for me, is relevant here. Yes, ARCO was more responsible for the landfill. And, yes, maybe in the larger scheme of things, that was the source of much of the contamination. But I know Judge Malloy, because I remember reading this several times, made a specific finding that your client was at fault to some extent because after acquiring the site and having knowledge of the problems that were going on, failed to take action in a timely manner and that that, in turn, contributed to the need for this remediation today. So that was a different factor, Your Honor? I mean, you're right. On the degree of care, he found that that slightly favored ARCO. But that was a different factor. I don't read his decision just saying that that somehow explained how he concluded that the first four factors, which go to basically the amount of contribution, responsibility for the contribution, were a wash. And, again, I mean, he found repeatedly, 197, 377, 392 are the ones that stand out to me, that the primary source of contamination at this site was ARCO's use of the West landfill. And that alone, I think, makes it highly inequitable to devote two-thirds of the cost to Columbia Falls. I'd like to reserve – I'm sorry, Your Honor. Can I ask a question? So you don't disagree that Judge Malloy applied the Gore factors, right? I don't disagree with that. I agree that he – All right. So your beef is basically that you don't agree with the way that he arrived at his conclusion. If I hear you correctly, he applied the correct law. He just arrived at the wrong conclusion, right? No, Your Honor. Okay. I may have been confused. My answer may have been confused. So he selected the Gore factors. We acknowledge that. Okay. I don't think he actually applied the Gore factors with respect to the first four factors because those would tell you to look for who was primarily responsible for the contamination. And here his own findings show that it was ARCO. Instead, he applied a different inquiry, the sort of linkage to remedial action inquiry, which isn't one of the Gore factors. So that in itself is an error.  I'm sorry. Okay. Okay. Thank you, Your Honor. We'll certainly give you adequate time for rebuttal. Let's hear from Counsel for ARCO. May it please the Court. I'd like to address each of the three issues that CFAC has raised in this appeal. But if I could take just a minute to put this case in some broader context, there are only a handful of circuit court cases out there that reverse district court equitable allocations. And I would submit that this is just not one of them. The Court here, you know, heard days of testimony. It took 800 exhibits, wrote 158 pages of findings of fact and conclusions of law, and addressed every factor and every fact that the parties asked it to address. And at the end of the day, CFAC here isn't complaining that there's a factor the court should have considered that it didn't or a factor that it did consider that it shouldn't have. It doesn't point to any clear issue or error of law. And it doesn't even— I think I disagree with you on that with respect to the contract. I think CFAC is very much saying that the court should not have taken into account the contract at all, which ended up being really the dispositive factor for going from 50 to 65. I understand their position a little differently, Your Honor. I think they have the position that the court can consider contracts, but just given that it's other findings about the contract, it shouldn't have applied it the way that it did here. I think the cases are— So let's just dive into that. The court, as your opponent says, at the beginning part— I mean, there's 100 pages in between, but at the beginning part of the decision, seems to pretty clearly say, with respect to the party's intent, that there was no intent to have this agreement cover CERCLA liability. And so if that's true, then how do you reconcile that with what the court then said later in the paragraphs that I was mentioning? So I disagree, Your Honor, that the court found that there wasn't intent to waive CERCLA liability. What it found was there wasn't enough evidence to show a specific intent to waive a statutory claim. And I think one of the things that CFAC is doing here is trying to take an absence of evidence to meet that high bar that the parties had to meet to show a specific intent to waive a statutory claim and say—turn that into an affirmative finding that the parties didn't intend to waive CERCLA liability. And those are just two different legal analyses. It's sort of the equivalent of you could be found not guilty on a criminal charge, but then be found civilly liable for the same conduct. And I want to point— Yeah, point me to— Sure. I'm looking at paragraph 46, but is there some other paragraph that I should be looking at? Well, and I will say there are paragraphs scattered throughout this discussion where the court is—reminder that the court is doing the contract analysis here. Right. And multiple times he says, for me to find waiver of CERCLA liability, I have got to find a very specific evidence that the parties intended that waiver of those statutory claims. That's at paragraph 43, 78, 85. He says it over and over again. Right. And so he's viewing the evidence here as, is it going to meet that high bar to show a specific intent to waive a statutory claim? And he can't get there. And that's why—I mean, we want to—we thought 100 percent of the liability should be on CFAC. And he said, there's just not enough specific intent there for me to get to that point. But back to the paragraph that you recounted, paragraph 410, that's where he lays out— but here's my big picture thinking about this. Maybe they didn't meet that high bar to get a complete contractual bar to CFAC's liability, or excuse me, to Atlantic Richfield's liability. But nevertheless, there was a lot of intent that they intended to shift all of these CERCLA liabilities, all of these environmental liabilities onto CFAC after 1985. Can I follow up with that? Because earlier I remember reading in the decision that with respect to interpreting Clause 10B, the second part of the indemnification clauses, that there was no extrinsic evidence one way or the other that spoke to CERCLA liabilities itself. And I'm having a hard time reconciling these different findings. And, you know, conceptually I understand your point that you have to meet a high bar for waiver, but there might be evidence beneath it. But what is that evidence? Because there just seems to be an absence of evidence that there— otherwise spoke to CERCLA liability itself. So, and I think to respond to that specific paragraph you're talking about, Judge Sanchez, again, it's was there any extrinsic evidence that specifically talked about a CERCLA claim? No, there wasn't. Was there evidence that suggested that the parties intended a very broad transfer of responsibility for environmental liabilities that would include CERCLA? Yes. And so let me tell you what that evidence was. First, there's the structure of the entire agreement, which, you know, sets up that there's going to be these very broad indemnities going both ways. But, of course, the one for Atlantic Richfield is limited to a five-year period. And after that, all the indemnity obligation is on CFAC. And, again, very broad— Can I pause you for a second about that? Because as I read those provisions, there seems to be a clear delineation. Environmental conditions pre-sale, that's Atlantic Richfield. Post-sale, then there's CFAC. And I agree there's a limitation in the time that one can bring in a indemnity claim, but otherwise there's quite a balance between division of labor, who was responsible for what environmental conditions before or after. Why does that structure or language suggest a wholesale shifting of CERCLA liabilities to one side? Well, I think it's the fact that after five years, CFAC could not come seek indemnity from Atlantic Richfield for anything before or after the acquisition date. They were barred entirely from using that indemnity, even for liabilities that preceded the acquisition date. And I think that—and the court found that that showed a shift of an intent of the parties to shift those liabilities onto CFAC. But not on CERCLA, right? Just contractual indemnity claims you couldn't bring after five years. Again, I think that the findings are there just wasn't a specific reference to CERCLA that made it such that we could use it as a complete bar. But again— But why isn't that significant? So you have environmental conditions. There are multiple avenues that one can get at it. You can file an indemnity claim within time, or you can file a CERCLA action outside of that time period. Those are two different avenues for relief. The fact that there's an absence of discussion about CERCLA, on the one hand of the decision, should mean something when you're allocating later on, saying that the fact that that absence of discussion somehow nevertheless shifted things over, doesn't it? Well, I think Cadillac Fairview completely controls this question because in that case—and I want to make a point of this because CFAC addresses one aspect of Cadillac Fairview in their brief, the part that talks about the jurisdictional defect. But there's two sections in that analysis, and the second part talks about the scope of the release. And the government there said, look, this release didn't cover CERCLA, therefore you shouldn't be able to consider it in your equitable allocation. And this court explicitly rejected that analysis. It said, because it was considered as an equitable factor, the precise scope of the release is immaterial. And I think that finding, Judge Sanchez, is dispositive on this issue here, where, again, the precise scope of this release, the court couldn't find enough specific intent that it waived CERCLA claims, but it was absolutely fair for it to consider it as part of the equitable allocation, and that is the exact holding of Cadillac Fairview. And I would note that CFAC— But I don't quibble with the notion that one can look at the contract and consider it for equitable allocation. If anything, Cadillac suggests to me, because ARCO is in the position of the government. ARCO was the one that polluted prior to the sale of the site, and Cadillac seems to be a little bit more in CFAC's position where they're not bringing a contractual claim. They're bringing an equitable contribution claim, which was permitted under Cadillac as well, wasn't it? It was an equitable allocation happening under Cadillac Fairview. I'm not necessarily seeing the significance of the roles of the parties. The point is, regardless of the precise scope of the indemnity between them, it was fair game for the— and the fact that it didn't specifically address CERCLA, it was fair game for the district court to consider it and there to use it to assign 100% of the liability to the government. Here, of course, the district court didn't even use it. It used it as one equitable factor and weighed it in light of all the facts that it considered and used it to just say that— you know, to shift 15% of the liability. Can I ask about that? So how did the court get to the 65-35 split? Because it refers to the contract as the dispositive factor. But what in the contract suggests that kind of allocation or do we—was there a problem with the court arriving at a 65% number where it seems difficult to trace how it got there? Or is it enough to say, you know, I can reach out and grab this for equitable purposes and that's enough? Well, I will say, I mean, the court considered many, many factors in arriving at this ultimate allocation. I do think it thought that the contract was something that supported a shift of responsibility to CFAC. With respect to the precise percentage, this is not done with mathematical certainty, nor was it required to be. This was a qualitative assessment that the district court made and what he thought was fair. And it was consistent, I would say, and to come to the Beezer case, I find this case to be directly on point with Beezer. I think— Do you think that maybe Judge Malloy was perhaps thinking, you know, if—I'm in a court of equity, right? We're going to do what's fair, right? Do you think that maybe he was thinking, by gosh, if I were to enforce this contract, ARCA walks away with no remediation costs exposure, CFAC gets all of it. So maybe I have to find some way to give both sides something and maybe the way I can do that is by somehow talking about this contract. If I enforce the contract completely, what is it, 10A Part 3, I think it is, if I enforce that, ARCA winds up walking away scot-free and CFAC winds up having to pay all of this. I've got to find some way to shift these costs. Do you think that might have possibly been going through his mind? I don't want to presume to speak for Judge Malloy, but certainly it was our view that we should not have any responsibility for the site. He didn't get there, but thought that it was fair to take that into consideration. And, Judge St. George, just to finish this out, because I think there are important aspects of this beyond just the words of the contract, and I can't remember which of you raised it, but it was the structure of this entire deal, you know, that we sold the entire facility to them for $1. They knew exactly what the condition of the facility was. We also guaranteed to fund their operations for four years to ensure that the whole operation was going to be profitable for them. And we wouldn't have done that with this indefinite future potential high liability for environmental responsibilities for all time. That makes no sense. And the district court was aware of all of this. So let me ask you this, because I was wondering about this. So when ARCO sold this facility, they sold the whole thing, the whole apple, right? Correct. So I was wondering why Judge Molloy excluded the $659 million of electricity revenues that were generated during CFAC's tenure, because that's not an insignificant amount. But I was trying to figure out how. I mean, I know you said it's not part of the smeltering process or whatever, but it is part of what CFAC bought, right, for $1. I agree with you, Your Honor. No, I think you would. We thought, of course, that that should be part of the analysis. And, again, I think this comes back to the fact that Judge Molloy weighed a lot of different factors and a lot of different facts. We lost on a lot of them. CFAC lost on some of them. They're here to complain about the few things that didn't go their way. And I want to turn to your economic benefit point since you brought it up. CFAC below took the position that profits shouldn't be considered because there are so many things that impact the amount of profits that a company makes at a site like this that have nothing to do with environmental contamination. That was their position. This is at the supplemental excerpts of the record, pages 4 through 6. And then they said, but if you do consider it, don't count the profits that we made off the electricity sales, and this should be a neutral factor. So that was their position below. They put on no evidence that this factor should cut in favor of them. And so I think to say that the district court abused its discretion by ultimately landing there doesn't carry much water when that was specifically the position that they took below. And, again, the economic benefit, this is not a math problem. The district court wasn't making a balance sheet. He looked at the relative profits. He looked at the relative capital investments, like you pointed out, Judge Watford, and looked at the investment that CFAC had made in the property and its return on that and considered all of those things to ultimately decide that that factor was a push between the two parties. So, again, absolutely no abuse of discretion there. And then let me come back to the primary contributor point as well. I think that argument can only have legs if you buy into this notion that there is some rule, that there is a polluter pays law that the court has to follow in doing its equitable allocation. We know that that's not true. This court has said it multiple times, said it in Boeing, said it in Western Properties. Equitable allocation is not a pro rata exercise of who contributed what to the site. And we also know that it's completely permissible for the court to consider how the party's contributions led to the remedy that was required. And here, to go back to the findings that you talked about, Judge Watford, the court said, look, the main remedy that's got to happen here, this slurry wall, has got to encompass both the wet scrubber sludge pond and the west landfill. More of it has to encompass the wet scrubber sludge pond. And because I know that CFAC is the one that contributed contaminating material to the wet scrubber sludge pond, I'm going to say that that's a fair way to divide this up. Can I ask this? What seemed absent from Judge Malloy's findings that would have been relevant on this point is a finding that said, you know what, the remedy necessary here to build this wall, it would have been required even if we had just had the contamination from the pond, right? In that scenario, I can see how the judge might have said, well, you know, yes, ARCO might have been more responsible for the landfill. CFAC may be more responsible for the pond. But, you know what, we'd have to do this anyway. And so that's why it's a wash. I got the sense that the contrary is true, that really it's the landfill that's generating the massive need for this remedy, and it's the pond that's kind of a secondary contributor. Is that wrong? I don't think that's true, Your Honor, because each of these things is contributing contamination to the groundwater. If the wet scrubber sludge pond weren't its own problem, you wouldn't need to build this slurry wall all the way around it. And, again, it's a large endeavor, and there would certainly be other ways to address that separately if it also weren't required. Now, maybe only that part of it would be required if the West landfill didn't exist. Or maybe there would be some other way to deal with it on its own. But, I mean, the reality here is that the CFAC proposed a remedy that encompassed both of these things. And I want to come back again to the point that you made, which is, you know, again, this polluter pays law is entirely wrong. And one of the most important reasons why is because you have a party like CFAC that acquired this site with full knowledge of what the contamination there was, owned it for almost 30 years, owned the West landfill, could have taken any number of steps to stop the spread of contamination into the groundwater from that site, and didn't do it. And that is just as important as a contribution to the contamination in the first place, particularly where there's an evolving understanding of what the nature of these contaminants are and what needs to be done with them. I mean, even if an owner has contributed nothing to contamination, they can very easily be responsible for a significant amount of an equitable allocation because of their failure to take action to remedy it. And I think that's important, too. I was going to say that I would almost think you'd be arguing for a 50-50 split in that case. I mean, and really what it comes back to is the analysis of the contract itself that tips it over one way or the other. And so just to wrap a bow in our earlier discussion, is your best argument for the notion that even if there was no waiver, that there was an intent by the parties to shift more of the circular liabilities to CFAC? Is it the structure of the contract or some sort of extrinsic evidence in particular? What do you think is the best evidence to guide you in that way? The structure of the contract, the circumstances of the sale, which provided a great deal of benefit to CFAC that would not have made sense with some enormous future environmental liability to be retained by Atlantic Richfield. The knowledge of the parties equal about what was at the site. And then there are the two instances of that period of time leading up to the five-year deadline for CFAC to bring its claims, where they first try to say, hey, we want to get in all of these future environmental liability claims before the five-year deadline runs out, showing that they understood that they were going to be responsible for those in the future. Then they tried to amend the agreement to give them a longer time to bring those claims into the future. And, of course, Atlantic Richfield said, no, that wasn't our deal. We don't agree to that, and they didn't get it. And so both of those pieces of evidence of subsequent conduct also confirm that they understood that they had environmental liabilities for the future. And then just to come finally to the remedy that they request here, like I said, there's only a small number of cases out there where circuit courts reverse equitable allocations. And I don't know of a single one where a circuit court has said back to the district court, and here's the percentage allocation that you need to do on remand. That's what CFAC has asked for here. I think that would be entirely inappropriate, and they basically would be asking you to substitute your judgment for the district court's without the benefit of having heard the entire trial and seen the entire record. Can I ask you one more question about the contract? I don't know if you have the decision in front of you there handy. The findings of fact? I just want to ask you about paragraph 46. That's the one I mentioned. Okay, yeah. I mean, just help me understand what is Judge Malloy finding other than that the parties did not intend for this, whatever they agreed upon, who's going to bear responsibility for what? They did not agree that CFAC would be giving up its right to bring a circular contribution claim. Again, I disagree with that phrasing. I think what they found was that there wasn't evidence that they specifically thought about circular claims, not that they intended the opposite, not that they intended CFAC to be free of those, only that there wasn't evidence that they specifically considered it such that it would be a complete bar to liability. Okay, let me just read that first sentence then. Although the plain language is unambiguous, I mean, he already had made a finding that the term of the contract is unambiguous. Yeah, CFAC did not give up its right. But he says even if the agreements with respect to language was sufficient to create an ambiguity, I'm going to give you the benefit of the doubt on that, the extrinsic evidence shows that CFAC did not waive its statutory rights, period, full stop. There's no qualifying, well, I'm not sure, there's a really high bar, and the evidence just fell short. There's just a flat-out finding that it did not do this. And, Your Honor, I see my time has expired. May I answer your question? Of course. Again, there's no extrinsic evidence that CFAC specifically or the party specifically thought about CERCLA claims. And I think you have to read that paragraph in the context of the law that the court is looking at right there, which is, do they meet this high bar for the complete contractual waiver? And the answer was no. But when you compare that to what the district court clearly laid out in paragraph 410 as to his reasoning on these issues, it's clear that while he didn't think they met that high bar, there was evidence that they intended to transfer liability for all of these claims. And, again, that's exactly the reasoning of the court in Beezer as well. Okay. Thank you very much. Appreciate your argument. Let's put three minutes on the clock for rebuttal, please. Thank you, Your Honors. On the contract, we think you're exactly right. Judge Walford, if you look at paragraphs 46, 87, and 88, the court made clear it was finding there was no intent to shift CERCLA liabilities. ARCO could have cross-appealed that. They didn't cross-appeal that. They didn't even make arguments to that effect in their brief. They're bound by the contractual ruling, and much of what I heard from my friend today is equivalent with the district court's own contractual ruling. The fact that the district court made those findings distinguishes this case from Cadillac and from Beezer. If you look at the Trinity decision on page 361 from the Third Circuit, the court said, critical to our holding in Beezer was the fact that the district court determined that both parties expressed a mutual intent to shift CERCLA liabilities. That is completely absent here. Cadillac is just different because the contract, by its terms, covered CERCLA liabilities, but was signed before CERCLA, so there couldn't have been an intent. Here, everybody knew about CERCLA. The district court found at paragraph 86 that ARCO itself was a sophisticated party that had many CERCLA actions against it. I mean, a logical conclusion is the parties just didn't address this in their contract, and that's what the court found. On primary contribution, Your Honors, I think you're right again, Judge Watford, that the district court never found that whatever was going on at the wet scrubber sludge pound somehow outweighed or created more harm or even equal harm as what happened at the West landfill. I mean, my friend, and ARCO dumped the most hazardous materials in the West landfill for decades in unlined landfill, and, you know, and the district court found that they were primarily responsible for the site contamination under any equitable balance, and that would favor in terms of more costs for ARCO. On economic benefits, I'd point you to paragraph 419 in which the court specifically said it was not appropriate to consider the capital offset, and I would just conclude by saying we are not challenging the district court's findings. We're saying the court has to hold the district court to its own findings, and when you do that, its analysis doesn't hold up. It's inconsistent, it's irrational, and it's unexplained. We would therefore ask this court to set aside the allocation. Okay. Thank you both for your very helpful arguments this morning. We appreciate it. The court is adjourned for the day. All rise.
judges: WATFORD, SANCHEZ, Benitez